PURE OIL COMPANY, Appellant,

v.

Tracy L. SNIPES, Appellee.

No. 18718.

United States Court of Appeals Fifth Circuit.

June 30, 1961.

---

William A. Brinkhaus, Edward Dubuisson, Dubuisson & Dubuisson, Opelousas, La., for defendant-appellant.

Nolan J. Edwards, Crowley, La., Gerald A. Stewart, Herbert W. Christenberry, Jr., Stewart & Mestayer, New Orleans, La., Edwards & Edwards, Crowley, La., for plaintiff-appellee.

Before JONES and BROWN, Circuit Judges, and DE VANE, District Judge.

JOHN R. BROWN, Circuit Judge.

At the heart of this appeal[1] is the question whether under the Outer Continental Shelf Lands Act, 43 U.S.C.A. §§ 1331–1343, the applicable substantive law for an injury received in connection with a fixed off-shore platform is that of Louisiana, the adjacent state, or the general maritime law. What makes an answer decisive is the problem of timeliness of the suit. For if the occurrence is governed by Louisiana law, it is conceded that a suit filed 22 months after the injury of November 6, 1956, is prescribed by the Louisiana one-year statute. LSA–C.C. Art. 3536. If it is maritime, then the equitable doctrine of laches controls.

■ The injury occurred on a fixed drilling platform owned and controlled by The Pure Oil Company. It rested permanently on vertical upright members securely affixed to the ocean floor. It was not, therefore, the floating-submersible type dealt with in Offshore Co. v. Robison, 5 Cir., 1959, 266 F.2d 769, 1959 AMC 2049. The platform was located in the Gulf of Mexico about 65 miles off the coast of Louisiana. This location was substantially seaward of Louisiana's historic extended maritime boundary recognized in the Submerged Lands Act, 43 U.S.C.A. §§ 1301–1315. Whether measured in terms of Louisiana's claim or the boundary finally delineated in United States v. States of Louisiana, Texas, Mississippi, Alabama and Florida, 1960, 363 U.S. 1, 121, at page 66, 80 S.Ct. 961, 4 L.Ed.2d 1025, 1096, this platform was in the area defined in the Outer Continental Shelf Lands Act. As all must be judged finally by this Act, it is important at the outset to emphasize the comprehensive, unqualified, unlimited claim of Federal sovereignty asserted and accomplished by that statute.

The Act first provides that "It is declared to be the policy of the United States that the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter." § 1332(a). In a sweeping way it then provides that "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed

1. Snipes v. Pure Oil Co., D.C.W.D.La., 1960, 186 F.Supp. 373.

structures which may be erected thereon * * * to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State. * * *" § 1333(a) (1).

The decision of what law controls is therefore a problem in statutory interpretation of a congressional enactment. Guess v. Read, 5 Cir., 1961, 290 F.2d 622.[2] It is in no sense one of those cases of undulating conflicts of state versus national power inevitable and irrepressible in our unique federalism.

The plaintiff Snipes was not working for Pure. He was an employee of Loffland Brothers Drilling Company. By two separate but identical formal, written agreements with Pure, Loffland had undertaken to drill two wells from the platform. Loffland was described as, and was, an independent contractor. The claim of Snipes against Pure was therefore the now familiar suit against a third party. Success by Snipes depended upon establishing some independent negligence on the part of Pure. Under the contract Loffland was to supply the drilling rig and its normal incidental equipment. Pure was to supply, among other things, the derrick, the platform and " * * * all necessary casing, tubing * * * valves, fittings *flow line connections*, * * * and all mud treating compound * * * also * * * fuel and water * * *." (Emphasis added.)

The occurrence of this accident may be briefly described. The platform deck is about 50 feet above the water. Since the first of the two projected wells had been completed, it was necessary to skid the drilling rig from one position on the platform to another one on the same platform in order to commence drilling the second well. This was to be done by a series of blocks and jacks. Before the

rig was to be skidded it was necessary to dismantle a pipe which ran from the hydraulic brake of Loffland's rig to a fresh water tank. The tank belonged to Pure and was a part of the permanent equipment of the platform. It was constructed of metal. The top of it presented a curved surface approximately 15 feet above the deck of the platform. There were no handrails or other safety life lines around the edge of the tank top, although the tank was equipped with a permanent welded ladder evidencing the likelihood that workmen would be going to and from the tank top from time to time. The water from the tank went to the hydromatic brake through a "suction" line and was returned to the tank by the overhead line. This pipe was suspended horizontally above the platform and ran from the rig to the top of the water tank.

It was this pipe which had to be dismantled to permit skidding the rig. This was being done by Snipes and his fellow Loffland employees. Snipes went to the top of the tank in order to lift the tank end of the pipe out of the hole through which it entered the tank. After doing this and while Snipes was sliding the pipe across the tank top so that the other workers standing on the deck could lower it to the platform, the pipe, still in a horizontal plane, broke at a collar joint. When the breaking permitted one end of the pipe to drop toward the platform, the end on the tank top moved abruptly upward. As a consequence Snipes was thrown from the tank top. In falling he struck the platform deck 15 feet below. But he did not land there. Earlier that morning employees of Pure had removed some sections of the expanded metal grating next to the tank thus leaving a space about 3 feet by 20 feet. This space was

---

1. This essential nature of the inquiry was emphasized in this case recently decided by this Court. An offshore oil rig employee was killed when a company helicopter in which he was riding crashed into the Gulf shortly after leaving the rig. In that case, though, the questions involving the interpretation of the Outer Continental Shelf Act with which we are

here concerned were not reached for two reasons. First, the Louisiana direct action statute sought to be invoked was not applicable by its own terms, and second, the death occurred literally on or over navigable waters of the High Seas within the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq., and did not occur on the offshore structure.

not at the edge of the platform. Rather it left a "hole" in the platform near the tank. After momentarily striking the platform deck, Snipes fell through the open space and dropped into the ocean 50 feet below. In the course of this fall, he hit at least two steel structure members. Despite his injuries, he was able to get to a ring life buoy thrown to him. This kept him afloat for the estimated five to fifteen minutes during which time he was drifting quickly away from the platform under a strong tidal current. He was picked up by a Pure motor launch summoned to the scene by a radio emergency May Day alarm and was shortly thereafter transferred by airplane to a hospital ashore. His injuries were severe, the hospital and medical treatment long and extended, and substantial permanent disabilities resulted.

In every sense of the word this happened on the high seas. It did not happen in Louisiana. Nor did it happen in waters which Louisiana could regard as within her territorial boundaries. If Louisiana law is to apply, it is because Congress has specified that this is so. Pure contends that this is the consequence of § 1333(a) (2) which "To the extent that they are applicable and not inconsistent with this sub-chapter or

with other Federal laws and regulations * * * * " adopts as Federal law the civil and criminal law of the adjacent state for the subsoil, seabed and offshore structures. Such "civil and criminal laws of each adjacent State * * * are declared to be the law of the United States * * *." [3]

■■ We think that a consideration of both intrinsic and extrinsic factors requires the conclusion that it was the intention of Congress that (a) this occurrence be governed by Federal, not State, law, and (b) that the Federal law thereby promulgated would be the pervasive maritime law of the United States. In connection with the latter phase—the choice by Congress of maritime law—it is again important to keep in mind that we are in an area in which Congress has an almost unlimited power to determine what standards shall comprise the Federal law.

On this approach we are not confronted with the question whether Congress would have the constitutional power to declare as to these offshore activities that for an essentially maritime matter a nonmaritime standard is to be followed.[4] At most, we have a question whether Congress may treat an occurrence in this new geographical area as substantially maritime even though on traditional

3. 43 U.S.C.A. § 1333(a) (2) reads in full:
"(2) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State as of the effective date of this subchapter are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area. All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxa-

tion laws shall not apply to the outer Continental Shelf."

4. We get a fresh reminder every year that Southern Pacific Co. v. Jensen, 1917, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086, is very much alive. Kossick v. United Fruit Co., 1961, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56. As a sequel to Jensen, the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., was enacted to overcome the adverse decisions holding that Congress constitutionally could not adopt for maritime workers local state compensation statutes. Knickerbocker Ice Co. v. Stewart, 1920, 253 U.S. 149, 40 S.Ct. 438, 64 L. Ed. 834; State of Washington v. W. C. Dawson & Co., 1924, 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646; 1924 AMC 403; Gilmore & Black, The Law of Admiralty § 6–45, 46 at 333 (1957).

lines an event taking place on a structure fixed permanently to the bed of the water might be regarded as non-maritime. For that matter, even in the development of that decisional law, the course was never fixed and there were frequent conceptual deviations. Thus, while damage by vessels to a pier was non-maritime, The Plymouth, 1866, 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125, damage to a beacon or similar structure maintained primarily as an aid to navigation, was maritime. The Blackheath, 1904, 195 U.S. 361, 25 S.Ct. 46, 49 L.Ed. 236; The Raithmoor, 1916, 241 U.S. 166, 36 S.Ct. 514, 60 L.Ed. 937. After considerable difference of opinion in the lower courts, the Supreme Court finally held in The Admiral Peoples, 1935, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633, 1935 AMC 875, that injuries received on the dock as a result of falling from a defective ship's gangway was maritime. In T. Smith & Son, Inc. v. Taylor, 1928, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520, 1928 AMC 447, a longshoreman standing on the wharf projecting a few feet over the water was struck by a sling load of cargo and was knocked into the water where he was some time later found dead. The Court held that occurrence was subject to the local law, not maritime. In contrast in L'hote v. Crowell, 5 Cir., 1931, 54 F.2d 212, 1932 AMC 27, we held that a longshoreman working ashore who violently hit the side of the vessel while riding the ship's tackle and thereupon fell to the wharf sustained maritime injuries.[5] In Minnie v. Port Huron Terminal Co., 1935, 295 U.S. 647, 55 S.Ct. 884, 79 L.Ed. 1631, 1935 AMC 879, the longshoreman on the deck of the vessel was struck by a swinging hoist precipitating him to the wharf. These injuries were held to be maritime. Many of these refined distinctions are now of historic and academic interest only since Congress cut through many of them by the 1948 Act which extends admiralty and maritime jurisdiction to "all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C.A. § 740. Its constitutionality has been upheld. United States v. Matson Nav. Co., 9 Cir., 1953, 201 F.2d 610, 1953 AMC 272.

But whether the injuries received in the fall which caused Snipes first to strike the deck of the platform then fall through the open space after which he banged against two girders and then dropped into the ocean where further distinguishable severe damage was done[6] would, as an academic inquiry on maritime or non-maritime jurisdiction, constitute a maritime injury under the historic standard of "the substance and consummation of the occurrence which

5. Certiorari was granted and our decision was reversed 1932, 286 U.S. 528, 52 S.Ct. 499, 76 L.Ed. 1270, 1932 AMC 1451. But subsequently the Supreme Court in the Admiral People and Minnie, supra, disclaimed any purpose of disturbing our decision on maritime jurisdiction. 295 U.S. 649, at pages 653–654, 55 S.Ct. 885, at page 887 and 295 U.S. 647, at page 649, 55 S.Ct. 884, at page 885.

6. A principal injury was a compound fracture to the left elbow. The treating physician, retained by Travelers Insurance Company, the compensation insurer for Loffland and, the record shows, also the liability insurer of Pure (cf. Czaplicki v. SS Hoegh Silvercloud, 1956, 351 U.S. 525, 76 S.Ct. 946, 100 L.Ed. 1387, 1956 AMC 1465) was uncontradicted in his testimony that Snipes had "a disability * * which is on the order of 50% of loss of use of the left elbow, left wrist and left hand or a 25% disability of the left upper extremity as a whole." These "residuals of a septic arthritis * * * responsible for the * * * crepitation in the elbow on motion * * *" were such that the doctor stated that he did "not believe that his patient should return to his duties as a roughneck." This was tracer to the fact that the wound at the side of the compound fracture became infected. The "infecting organism was one of the paracolon group * * *" and this the doctor concluded was from "contamination of the water about the rig platform * * *" from inadequate dispersal from the platform's sanitary facilities.

The severe permanent disabling injuries are therefore traced directly to the fall into the water. There can be nothing more maritime than the sea.

gave rise to the cause of action" [7] is not decisive. This is so because the Outer Continental Shelf Lands Act itself reveals that when it is federal, not adjacent state, law to apply, Congress adopted the maritime standards. At least two specific items evidence this. This evidential material serves a dual role: in demonstrating that (1) Congress chose the maritime law as the federal law it proves also that (2) federal, not state, law was to apply.

■ First, Congress committed to the agency traditionally charged with regulation and enforcement of maritime matters the duty and "authority to promulgate and enforce * * * regulations with respect to * * * safety equipment, and other matters relating to the promotion of safety of life and property * * *" on the artificial islands, structures or waters adjacent thereto. The agency specifically named was the Coast Guard.[8] Contrary to the contentions of Pure, this statutory obligation and authority transcends the mere marking of the structures either as an aid to navigation or the warning of its presence as an obstruction. See also § 1333(e) (2) and (f). In accordance with the statutory mandate the Commandant of the Coast Guard has promulgated extensive regulations which reflect a view that whether manned or unmanned, fixed or submersible, these oil well drilling structures located in the midst of the high seas present substantially all of the perils of the seas [9] and are therefore to be regulated as such.[10] One such hazard expressly

7. This expression was employed in T. Smith & Sons v. Taylor, supra, 276 U.S. 179, at page 182, 48 S.Ct. 228, at page 229. It had been used 60 years earlier in Hough v. Western Transportation Co., 1866, 70 U.S. 20, at page 34, 18 L.Ed. 125, at page 128; see Thibodeaux v. J. Ray McDermott & Co., 5 Cir., 1960, 276 F.2d 42, at page 49.

8. Section 1333(e) (1). "The head of the Department in which the Coast Guard is operating shall have authority to promulgate and enforce such reasonable regulations with respect to lights and other warning devices, safety equipment, and other matters relating to the promotion of safety of life and property on the islands and structures referred to in subsection (a) of this section or on the waters adjacent thereto, as he may deem necessary."

9. Quite apart from any consternation felt in some quarters or difficult legal problems relating to the status of seamen which was the precise point in Grimes v. Raymond Concrete Pile Co., 1958, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737, 1958 AMC 1014, the recent destruction of a similar Texas Tower in the North Atlantic with the loss of all hands on board demonstrates that the hazards faced are the foreboding perils of the sea.

10. These are found Title 33, C.F.R. § 140 to § 146.05–35. Except for minor amendments, these were promulgated February 9, 1956, to become effective July 1, 1956, prior to the date of the injuries in this suit.

The regulations are established "to implement section 4(e) (1) [43 U.S.C.A. § 1333(e) (1)] * * * of the Act," § 140.01–1(b). The term "artificial islands and fixed structures" includes "both mobile and built-up platforms, whether manned or unmanned * * *," § 140.-05–1. The regulations pertain "to special safety construction features required, emergency equipment, life saving appliances, fire-fighting equipment, emergency operation procedures, and special inspections thereof by the Coast Guard." § 140.05–5(a). They cover "a building or platform secured to the seabed by fixed means or submerged onto the seabed * * *," § 140.10–5. Responsibility for enforcement is committed to the District Commandant in turn to the "Officer in Charge, Marine Inspection, within his marine inspection zone, to perform or have performed the inspections, enforcement, and administration of the regulations * * *," § 140.20–1. Penalties as prescribed in § 1333(e) (2) are specified, § 140.25–5. Appeals from regulations, proposed regulations and enforcement decisions are prescribed through Coast Guard and court review, § 140.25–1 to 5. The Officer in Charge, Marine Inspection, is required to perform inspections of "the lifesaving appliances, fire fighting equipment, emergency equipment, observe emergency drills * * * and otherwise satisfy himself that all provisions of the regulations * * * have been complied with and that the emergency equipment is in good condition and satisfactory in every respect." § 142.05, 10, 20. Part 143 covers construction and arrangement

recognized is the likelihood of falling on to the deck or into the ocean.[11] This elaborate administrative establishment to assure reasonable safety to all persons working on such platforms without particular regard to their status as an employee, independent contractor, employee of an independent contractor, or service personnel reflects a dual congressional determination. The first is that as the hazards and risks are essentially maritime, it is appropriate that standards of safety be those imposed by the maritime law with policing and enforcement left to a traditional maritime agency. And second, it was a determination that this matter could not adequately be left to the adjacent states either in the creation of the underlying substantive standards or in their enforcement. Of course enforcement and effectuation of such congressional policy makes the question of sanctions, including that of civil tort liability, of like congressional concern.

The second indicia found in the terms of the Outer Continental Shelf Lands Act itself is its express adoption of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., as the basis of compensation for death or disability of an employee. 43 U.S.C.A. § 1333(c). This is of significance for several reasons. One has to do with general safety conditions showing again the congressional concern for a federal policy.[12] The other bears

"as necessary to comply with safety requirements contained in this subchapter," § 143.01–5. This includes specifically the means of escape, § 143.05–1 to 10, personnel landings, § 143.10–1, 5, and guards and rails for floor or deck areas and openings, § 143.15–1, and catwalks and stairways, § 143.15–5. Life floats, life rafts, their equipment, life preservers, ring life buoys, and emergency communications equipment are covered in §§ 144.01–1 through 40. Fire fighting equipment in § 145.01–10. Analogizing the structure to a vessel, § 146.01–2 requires the operator to "designate by title and in order of succession the persons on the platform who shall be the 'person in charge.'" Emergency equipment is required to "be maintained in good condition at all times," § 146.01–15. All manned platforms are required to have a general alarm system, § 146.05–1, 5, with established emergency signals, § 146.05–10. The Person in Charge shall assign duty stations for emergencies, § 146.05–15. Emergency drills are to be conducted at least once a month "as if an actual emergency existed" with a written, permanent report to the Coast Guard of such drills, § 146.05–25. A station bill (muster list) is to be prescribed and signed by the Person in Charge and posted in conspicuous places on the platform, § 146.05–30. All equipment, general alarm bells, life floats, boats, rafts, paddles are to be marked with the name or number or identification of the structure, § 146.05–35.

11. Among these regulations and of special interest here are:

"§ 143.15–1 *Floor or deck areas and openings.* (a) Except for helicopter landing decks * * * and areas not normally occupied, the unprotected perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence. The guard rail or fence shall be at least 42 inches high. The two intermediate rails shall be so placed that the rails are approximately evenly spaced between the guard rail and the floor or deck area. * * *.

"(b) The unprotected perimeter of the helicopter landing deck shall be protected with a device of sufficient strength and size as to prevent any person from falling from such deck.

"§ 143.15–5. *Catwalks and Stairways.* Each catwalk and each stairway shall be provided with a suitable guard rail or rails, as necessary."

12. Under § 941 the Secretary of Labor was charged with making studies and investigations with respect "to safety provisions and the causes * * * of injuries in employments" covered by the Longshoremen's Act. Subdivision (b) provided that in carrying out "the provisions of this section" the Secretary's representative "is authorized to enter * * upon any premises, tracks, wharf, dock, or other landing place, or upon any vessel, or to enter any building, where an employment covered by this chapter is being carried on, and to examine any tool, appliance, or machinery used in such employment." 33 U.S.C.A. § 941(b).

This section was markedly amended August 23, 1958, Public Law 85–742, § 1, 72 Stat. 835. For the first time it authorized the Secretary to prescribe protective safeguards and devices and to maintain safe employment practices and conditions under sanctions of civil injunc-

directly on the subject at hand—a suit by an injured employee against a third party. By § 933 elaborate provisions are made concerning suit by the injured person or in some situations by his employer (or insurance carrier).[13] Of course § 933 does not purport to define the substantive basis upon which the third person "is liable in damages" to the injured employee. It does not confine it to federal law, or to state law, or to maritime law, to common law or to civil law. Presumably it embraces whatever law is legally available. But § 933 certainly undertakes to secure to the injured employee whatever rights to damages might be open. The provisions of § 905 prescribing that the Longshoremen's Act is the exclusive liability of the employer [14] does not operate for the benefit of anyone else and certainly not for a third party. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124,

at pages 130–131, 76 S.Ct. 232, 100 L.Ed. 133, 1956 AMC 9.

But that is not so in Louisiana. We have called this "the unique Louisiana policy" and of it have had this to say. "Unlike many other compensation acts, the Louisiana statute regulates *more* than the rights as between injured employee and his employer. Under some circumstances it controls the right of such injured worker against a third party not his employer. L.S.A.–R.S. 23:-1061. And as construed uniformly by the Courts this provides in substance that an employee of an independent contractor injured by the negligence of the third party for whom the independent contractor is performing the service has no right to recover damages if the work being performed was a part of the usual trade, business and occupation of such third party. His sole remedy against either his employer or such third party

tion, § 941(e), and penalties § 941(f). In the enactment of this far-reaching amendment, it was apparently recognized that § 941 in its original form granting, as it did, wide authority on the part of the Secretary of Labor to make investigations of safety and other employment conditions, created a conflict with a like responsibility committed to the Coast Guard under § 1333(e). Consequently, in the amendment § 941(a) provides that the Secretary of Labor "may not make determinations by regulation or order under this section as to matters within the scope of * * * § 1333(e) of Title 43." This is carried forward in § 941(g) (1) which declares that the "provisions of this section shall not apply in the case of any employment relating to the operations for the exploration, production * * * of mineral resources * * * under the authority of section 1331–1345 of Title 43, nor * * * lands * * * beneath the navigable waters as defined in section 1301–1303 and 1311–1315 of Title 43 * * *."

This is a further manifestation that Congress had a clear purpose to treat offshore oil activities as a special situation—a maritime situation—with full and sole responsibility committed to the Coast Guard.

13. 33 U.S.C.A. § 933(a). "If on account of a disability or death for which compensation is payable under this chapter

the person entitled to such compensation determines that some person other than the employer is liable in damages, he may elect, by giving notice to the deputy commissioner in such manner as the Secretary may provide, to receive such compensation or to recover damages against such third person."

Prior to the 1959 amendments, 73 Stat. 391, acceptance of compensation under a formal award operated as an irrevocable assignment to the employer who is thereafter given express authority to institute or compromise proceedings against the third party. Distribution of the proceeds of any recovery by judgment or compromise is specified with provision for payment of the excess remaining to the employee. Where the employee gives notice (as done in this case) of intention to sue, the employer is liable for the difference between the amount recovered in judgment and the amount due in compensation.

14. 33 U.S.C.A. § 905: "The liability of an employer prescribed in section 904 * * * shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, * * * and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death * * *." See Thibodeaux v. J. Ray McDermott & Co., supra, 276 F.2d 42, at page 45.

is under the Louisiana Compensation Act which itself carries the usual exclusive liability provision." [15] Kent et al. v. Shell Oil Company et al., 5 Cir., 1961, 286 F.2d 746, at pages 750–751.

What is true of Louisiana could be multiplied by as many states as are contiguous to the lands of the Outer Continental Shelf. What is true of Louisiana demonstrates that the congressional purpose to assure a right of action against the third party might be thwarted or completely prevented were the substantive principles to be those of the adjacent state. Congress knew from long experience the desirability—if not the constitutional necessity—of a substantial uniformity in dealing with matters maritime. It runs counter to the whole purpose of the Act to assume that Congress meant a matter of such importance as safety of life and limb should be left to the shifting policies of adjacent states.

The law applicable was therefore federal maritime law, not that of Lousiana. Consequently there being no Louisiana-created cause of action, the Louisiana one-year prescription period was not self-operative to bar this suit. But the question remains, is the one-year period of any importance, and if so, to what extent? Translating that inquiry into more tangible terms, it takes this form: for a maritime injury occurring within the geographical limits of Louisiana, such as, for example, the Port of New Orleans, does the local Louisiana law of limitations (prescription) bar the claim?

■■ That question is answered authoritatively both by general principles and by a specific recent case presenting that very problem. In Czaplicki v. SS Hoegh Silvercloud, supra, 351 U.S. 525, 76 S.Ct. 946, 100 L.Ed. 1387, 1956 AMC 1465, the plaintiff was injured in 1945 while working as a longshoreman on board the SS Hoegh Silvercloud in the Port of Hoboken, New Jersey. The suit

against the third party was filed in New York long after the statute of limitations of New York, New Jersey, or both had run. The Court of Appeals had held: "whether the statute of limitation of New Jersey, * * * or the statute of limitations of New York * * *, is our guide, the time has long since passed when the [plaintiff] might have recovered against the alleged tort-feasor." 2 Cir., 223 F.2d 189, at page 191. Reversing this the Supreme Court reiterated the long accepted principle of laches. "The Court of Appeals found it unnecessary to consider whether Czaplicki could maintain this suit, because it was held barred in any event on account of laches. The only reason given for this holding was that both the New York and New Jersey statute of limitations, the two that might be applicable, had run. It is well settled, however, that laches as a defense to an admiralty suit is not to be measured by strict application of statutes of limitations; instead, the rule is that 'the delay which will defeat such a suit must in every case depend on the peculiar equitable circumstances of that case.' The Key City (U.S.) 14 Wall. 653, 660, 20 L.Ed. 896, [898]. In cases where suit has been brought after some lapse of time, the question is whether it would be inequitable, because of the delay, to enforce the claim. * * * 'Where there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief.' Gardner v. Panama R. Co., 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31, [36]. This does not mean, of course, that the state statutes of limitations are immaterial in determining whether laches is a bar, but it does mean that they are not conclusive, and that the determination should not be made without first considering all the circumstances bearing on the issue." 351 U.S. 525, at page 533, 76 S.Ct. 946, at page 951. See also Gardner v. Panama R. Co., 1951, 342

---

15. Footnotes in the quotation have been deleted. These included citations to numerous cases, one of which, Dodge v. Anderson, 5 Cir., 1958, 255 F.2d 246, is typical.

U.S. 29, at page 30, 72 S.Ct. 12, 96 L.Ed. 31, 1951 AMC 2048, and Annotation 96 L.Ed. 37. We have several times applied this doctrine to suits against third parties to recover for maritime injuries sustained within the territorial confines of a state.[16]

Here there can be no basis for holding that the District Court abused its discretion in overruling the defense of laches. The injuries occurred November 6, 1956, and the complaint was filed September 15, 1958. The record establishes without contradiction that this slight delay of ten months beyond the Louisiana one-year period could not have produced any prejudice to Pure. It knew all about the case. Indeed, it was Pure's motor launch which rescued Snipes and arranged for transfer to the hospital. The defense of Pure was undertaken by Travelers Insurance Company which was also the compensation insurer of Loffland.[17] This mutual Insurer arranged for and paid the physician who treated Snipes. Pure was content to rely upon his medical report including the one covering re-examination made by him for Pure's account on the eve of the trial. As to the occurrence itself the facts were really not in dispute. What Snipes was doing, how he came to fall, where he fell, and what happened to him was the subject of little controversy. Nothing in this record suggests that the able and vigorous advocate

for Pure on the trial commencing March 15, 1960, would have had any further or better evidence, information or materials in the defense of an event occurring in 1956 had the suit been filed November 6, 1957, rather than September 15, 1958. "Laches is much more than time. It is time plus prejudicial harm, and the harm is not merely that one loses what he otherwise would have kept, but that the delay has subjected him to a disadvantage in asserting and establishing his claimed right or defense." Point Landing, Inc. v. Alabama Drydock & Shipbuilding Co., 5 Cir., 1958, 261 F.2d 861, at page 865, 1959 AMC 148.

Pure insists that nevertheless the judgment cannot stand because a directed verdict should have been granted on the ground that no showing was made of Pure's ownership or control of the return water line which broke. We do not regard this as decisive. There was considerable evidence of usage of those in the oil business from which the jury might infer that the "flow line connection" described in the contract as a piece of equipment Pure was to furnish would include this return water line. But this does not matter. Quite apart from that there was ample evidence to warrant the jury finding that the significant permanent injuries resulted from Snipes falling through the open space, against the girders, and then into the ocean. This condition admittedly was

16. In Morales v. Moore-McCormick Lines, Inc., 5 Cir., 1953, 208 F.2d 218, 1954 AMC 87, the plaintiff sought recovery for injuries received while working as a longshoreman aboard a vessel in a Texas port. On the peculiar facts we held that a suit filed 2½ years after the occurrence and beyond the time of the analogous Texas Statute of Limitations was too late. In McDaniel v. Gulf & South American Steamship Co., 5 Cir., 1955, 228 F.2d 189, 1956 AMC 105, the suit was by a longshoreman to recover damages from a vessel owner for injuries sustained while working aboard the vessel in a Texas port. The injury occurred February 13, 1949, and the libel was filed July 15, 1953, more than four years later and well beyond the Texas two-year statute. Recognizing the general principle of

laches we reversed the District Court's dismissal of the libel and held "that laches does not appear upon the face of the libel," 228 F.2d 189, at page 193. See also Vega v. The Malula, 5 Cir., 1961, 291 F.2d 415, involving a Puerto Rican longshoreman injured in 1954 on a Cuban vessel. We held suit in 1959 timely under the circumstances despite the one-year limitation statute. In Delgado v. The Malula, 5 Cir., 1961, 291 F.2d 420, for similar third party suit we held the suit untimely under the facts.

17. It was stipulated between the parties at the trial that Loffland and Travelers had paid weekly compensation to Snipes from November 7, 1956 through December 17, 1957. The payments totaled $3,132.00.

created by Pure's employees. There was no need for the grating to have been left off for that period of time. And it was for the jury, not the plaintiff by conclusory statements made in response to adroit cross-examination, to determine whether a prudent platform owner would have left it open. More than that, there was a serious issue about the absence of any guard rail on the tank top. The evidence showed, as the permanent ladder manifested, an expectation that men would work on the tank top from time to time. True, no specific word testimony was offered that on some other rig the tank tops generally had a rail. Evidence was received, however, that such a rail would have been easily installed at little expense. This was not a matter necessarily requiring expert testimony. The jury could have concluded that at that height, considering the curved surface and the possibility of falling onto the platform and perhaps into the sea, a prudent platform owner would have had some protective device. Of course the matter is not to be determined by what is usual and customary. That may be evidence of due care, or the lack of it, but it is not the end itself.[18] Quite apart from a question whether the Coast Guard regulations, note 10, supra, technically cover the tank top, it is evident from §§ 143.15–1, 15–5, Title ·33 C.F.R., that the Coast Guard considers that one of the principal hazards is that of falling from great heights. As a matter of everyday common sense the jury may well have thought the same here.

We find nothing to the complaints about the Court's charge. The charge as given was full and fair and in many instances repeated verbatim the charges requested by Pure.

■ Nor, within our limited power of review, do we find the jury verdict unreasonable. American Automobile Ins. Co. v. Wainwright, 5 Cir., 1960, 284 F.2d 942; Whiteman v. Pitrie, 5 Cir., 1955, 220 F.2d 914; Sunray Oil Corp. v. Allbritton, 5 Cir., 1951, 188 F.2d 751. Snipes had an income of $600 per month as a roughneck. The defendant's own doctor in 1960 on the eve of the trial adhered to his earlier estimate of permanent disability, see note 6, supra, and he was positive in his assertion given in 1957 that "I do not believe that this patient should return to his duties as a roughneck." Snipes' efforts to obtain employment were unfruitful. By the time of the trial he had lost for all practical purposes 3½ years' income which would alone account for some $25,000 of the verdict. The medical reports received in evidence by stipulation warranted a finding of permanent disability involving more than the left elbow. Considering the loss of wages and expenses already incurred, the pain suffered past and future, the prolonged recovery and convalescence period, and the commuted value of lost future earnings, the jury's award is fully supported.

We find no merit in the other contentions asserted. The claim was timely filed and the evidence warranted the finding of negligence resulting in serious and permanent injuries warranting the payment of a substantial sum of money. Those matters were answered by the jury's verdict. There it ends.

Affirmed.

---

18. Schlichter v. Port Arthur Towing Co., 5 Cir., 1961, 288 F.2d 801, at page 804; Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 2 Cir., 1956, 234 F.2d 253, at page 260, 1956 AMC 1367; The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737, 1932 AMC 1169, 1175; Universe Tankships, Inc. v. Pyrate Tank Cleaners, Inc., D.C.S.D.N.Y., 1957, 152 F.Supp. 903, at page 918, 1957 AMC 1436; 38 Am.Jur., Negligence § 34.