**LAREDO OFFSHORE CONSTRUCTORS, INC., Plaintiff-Appellant,**

v.

**HUNT OIL COMPANY, Defendant-Appellee.**

No. 84–2045.

United States Court of Appeals, Fifth Circuit.

March 11, 1985.

1224

Sharpe & Kajander, Stuart B. Collins, Houston, Tex., for plaintiff-appellant.

Shank, Irwin & Conant, Allen Weed, Linda A. Hale, Dallas, Tex., for defendant-appellee.

Before GARZA, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

In this case, we are called upon to determine whether a district court has subject matter jurisdiction over a contract dispute involving the construction of a stationary offshore platform on the Outer Continental Shelf outside state territorial waters. We hold that, insofar as the alleged breach of contract relates directly to platform construction, the controversy is one "arising out of, or in connection with" an operation conducted on the Outer Continental Shelf involving the development of mineral resources and therefore is encompassed within the district court's grant of original jurisdiction under the Outer Continental Shelf Lands Act. Accordingly, we reverse the judgment of the district court and remand with instructions.

I.

On November 23, 1981, Hunt Oil Company (Hunt) and Laredo Offshore Constructors, Inc., (Laredo) entered into a contract for the transportation and installation of an offshore oil and gas platform to be permanently affixed to the ocean floor on the Outer Continental Shelf. Under the contract, Laredo was to construct the platform at a well site 25 miles off the coast of Louisiana and to furnish all services and materials necessary and incident thereto. The purpose of the platform was to protect the wellhead of a gas well recently completed by Hunt and to provide access to that wellhead during production. The parties agree that the construction of the platform was a necessary step in bringing the well into final production, but that Laredo had nothing to do with either the drilling of the gas well or final oil and gas production.

The contract sets forth complete details of the work to be performed by Laredo, terms and conditions of payment, and other responsibilities of the parties.[1] After the transportation of all necessary equipment and labor to the well site, Laredo was to begin construction of the platform by setting a jacket over the wellhead. At that point, four piles were to be driven into the subsurface in order to secure the jacket to the seabed. Once the piles were driven to final penetration, Laredo was to weld the top of the platform jacket legs to the tops of each pile. Laredo was then to cut the piles off at the proper elevation, fit the deck onto the structure, and weld it in place. Finally, the entire structure was to be touched up with paint.

On July 11, 1983, Laredo instituted the instant action for nonpayment under the contract in the District Court for the Southern District of Texas. In its complaint, Laredo asserted that it performed its obligations under the contract until dismissed from the well site by Hunt. Hunt's subsequent failure to make payment due for the services performed, Laredo alleged, constituted breach of the contract. Hunt, in its response, contended that Laredo had driven the four piles into the subsurface upside down and, in attempting to rectify this error, caused further damage to the structure. Hunt explained that it had terminated the contract and dismissed Laredo because of the improper installation of the piles, the additional damage caused by Laredo, and the belief that Laredo's personnel

---

1. The contract proper sets out the general obligations of the parties and certain other standard clauses. Exhibit A of the contract describes the work as follows:

 1. Loadout, transport, and install materials including jacket, piles, and deck/helideck which make up the offshore structure designated Well Protector Platform E.I.–77–No. 6.
 2. Weld out deck plus ship loose items.
 3. Carry out diver inspection of the seabed for debris and obstructions within 50 ft. radius of the well conductor prior to jacket positioning.

 4. Blast and prime any weld and damaged areas with inorganic zinc and finish coats as per specifications contained in Exhibit "H".

 Exhibit B sets forth the general conditions of the work, such as provision for obtaining permits, protection of and access to the property, supervision, and insurance. Exhibit F contains technical specifications and detailed drawings of the platform that Laredo was to construct. The remainder of the contract for the most part prescribes safety procedures and delegates responsibility for pollution control.

and equipment could not safely complete the work.

Laredo's complaint was predicated on the admiralty jurisdiction of the district court over maritime contracts.[2] Hunt moved the court to dismiss the action for lack of subject matter jurisdiction, arguing that the principal subject matter of the contract at issue was the construction of an offshore oil platform, which Hunt alleged was not within the admiralty jurisdiction of the district court. Laredo contended that admiralty jurisdiction did exist since the contract contemplated the use of a considerable number of vessels and seamen and concerned offshore drilling for oil and gas, itself a traditional maritime activity. The district court granted Hunt's motion, reasoning that the litigation involved that portion of the contract relating to the actual building of the platform, which was held not to be maritime activity. From this order, Laredo instituted the present appeal.

On appeal, we raised *sua sponte* the additional question whether the district court had jurisdiction under the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331, et seq., over this suit and requested further briefings. In its supplemental brief, Hunt, while maintaining its position that the district court lacks admiralty jurisdiction over the instant case, now argues that jurisdiction does exist under the OCSLA. Laredo in its supplemental brief makes two arguments. First, Laredo asserts that the case at bar is not cognizable under the OCSLA but is within the admiralty jurisdiction of the district court. Second, Laredo takes the position that, even if the OCSLA does apply, maritime

2. On November 10, 1983, Laredo sought to amend its complaint to assert diversity of citizenship as an alternate jurisdictional basis. The district court, finding no diversity, refused to allow *Laredo to amend its complaint. Laredo* does not challenge the district court's denial of its motion to amend on this appeal.

3. 43 U.S.C. § 1333(a)(1) provides:
 The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artifical islands, and all installations and other devices

law should nonetheless govern the resolution of this case. We examine first the applicability of the OCSLA to the present context and then whether principles of admiralty control irrespective of that Act.

## II.

We begin our analysis of the jurisdictional reach of the OCSLA by looking to the language of the statute. The OCSLA extends the political power and laws of the United States to the subsoil and seabed of the Outer Continental Shelf and to the artificial islands, installations, and other devices erected thereon for the purpose of exploring for, developing, or producing subsurface resources. 43 U.S.C. § 1333(a)(1).[3] Toward this end, the OCSLA vests district courts with original jurisdiction over all cases arising out of such operations. The pertinent provision provides:

> [T]he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals....

*Id.* § 1349(b). "Development" is defined in the Act as "those activities which take place following discovery of minerals in paying quantities, including ... *platform construction.*" *Id.* § 1331(*l*) (emphasis supplied).

■ As the district court noted below, this litigation involves only that portion of the contract between Laredo and Hunt that

permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State: *Provided, however,* That mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter.

relates to the actual building of a platform on the Outer Continental Shelf. Under the Act, such construction is explicitly included within the range of activities constituting the "development" of the subsurface. It seems clear, therefore, that OCSLA jurisdiction over "cases and controversies arising out of or in connection with" these development operations, at least under the plain meaning of the statute, squarely encompasses the present litigation.

Laredo, however, asserts that, in enacting the OCSLA and its subsequent amendments, Congress did not intend to vest district courts with the jurisdiction to resolve under the Act contractual controversies such as the one at bar. Rather, Laredo contends, Congress adopted the OCSLA for the narrow purpose of establishing policies and procedures for managing Outer Continental Shelf oil and natural gas resources. Laredo's argument is that the OCSLA consequently must be construed in the light of these regulatory purposes, which do not, at least to Laredo, implicate the need to extend original jurisdiction to contract disputes over platform construction.[4]

■ There is no question that, in enacting the OCSLA, Congress was most concerned with establishing federal control over resources on the Outer Continental Shelf. The legislative history of the OCSLA, for example, reveals that the Act was originally enacted in 1953 in response to a congressional belief that the federal government lacked legal authority to lease out various sections of the Outer Continental Shelf for resource development. The OCSLA thus vests the federal government with a proprietary interest in the Outer Continental Shelf and establishes a regulatory scheme governing leasing and operations there.[5] Similarly, the 1978 amendments to the OCSLA were adopted principally to achieve regulatory ends. Congress amended the OCSLA to update government control of resource development on the Outer Continental Shelf and to ensure the promotion of the dual policies of resource production and environmental protection.[6]

---

4. In addition to congressional committee reports on the OCSLA, *see infra* notes 5–6, Laredo cites in support of this claim *Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel,* 569 F.2d 330 (5th Cir.1978), and *Olsen v. Shell Oil Co.,* 561 F.2d 1178 (5th Cir. 1977). We find both cases inapposite. In *Treasure Salvors,* we were faced with the question whether the United States had title under the OCSLA over a wrecked and abandoned vessel lying on the bottom of the ocean on the Outer Continental Shelf. We held that the OCSLA was not a general extension of United States sovereignty but must be construed to comport with its limited purpose of controlling the exploration of natural resources on the Continental Shelf. Since the exercise of political jurisdiction over a wrecked vessel would not in any way have furthered this purpose, we rejected the government's claim for control. The instant case is dissimilar to *Treasure Salvors* since the subject matter of this action directly relates to the production of subsurface resources and in fact involves a necessary step in the extraction operation. *Olsen* is likewise distinguishable in that there the only question was whether the legislative history of the OCSLA could support a finding of an implied cause of action under the guidelines set forth by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), a very different inquiry from the one presented here.

5. In its 1953 report on the OCSLA, the House of Representatives Committee on the Judiciary stated:

 *Necessity for legislation*
 Representatives of the Federal departments, the States, and the off-shore operators all urged the importance and necessity for the enactment of legislation enabling the Federal Government to lease for oil and gas operations the vast areas of the Continental Shelf outside of State boundaries. They were unanimously of the opinion, in which this committee agrees, that no law now exists whereby the Federal Government can lease those submerged lands, the development and operation of which are vital to our national economy and security. It is, therefore, the duty of the Congress to enact promptly a leasing policy for the purpose of encouraging the discovery and development of the oil potential of the Continental Shelf.
 H.R.Rep. No. 413, 83d Cong., 1st Sess., *reprinted in* 1953 U.S.Code Cong. & Ad.News 2177, 2178.

6. The House Committee on the Outer Continental Shelf delineated the purpose of the 1978 amendments to the OCSLA as follows:

 Specifically, the 1977 Amendments are to establish policies and procedures for managing Outer Continental Shelf oil and natural gas resources so as to better achieve national economic and energy policy goals. Oil and natu-

Nonetheless, for the reasons discussed below, we think that Congress also intended the Act to serve other, related objectives [7] and that Laredo's conception of the scope of the OCSLA is correspondingly narrow.

In *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), the Supreme Court in an exhaustive review of the OCSLA's legislative history, observed that "the purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures ... on the Outer Continental Shelf." *Id.* at 355, 89 S.Ct. at 1837. That this body of law, and the district court's correlative original jurisdiction were intended to govern the full range of potential legal problems that might arise in connection with operations on the Outer Continental Shelf is evidenced by both the Act and its legislative history. Section 1333(a)(2) provides that, to the extent they are not inconsistent with federal laws, the civil and criminal laws of the adjacent state are to be applied as federal law. If the OCSLA was intended only to govern those cases directly implicating the regulatory and proprietary purposes of the Act, there would have been no need to make available such a broad legal base, including both civil and criminal laws, upon which courts could draw to fill in anticipated gaps in federal law. Similarly, the Supreme Court's review of the history of the OCSLA as enacted in 1953, set out in part in the margin, reveals that Congress intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the Outer Continental Shelf.[8] It is apparent that Congress, in passing the OCSLA, made a determination that maritime law, which never before had to deal with the extraction of minerals from the sea bottom, was unsuited to the task and that state law as adopted federal law should control.[9] The conference com-

---

ral gas resources in the Outer Continental Shelf are to be preserved, protected and developed so as to: (1) Allow the resources to become available for domestic use as rapidly as possible; (2) provide for a balance of development with protection of the environment; (3) insure the public a fair and equitable return on the resources; and (4) preserve and maintain competition.

H.R.Rep. No. 590, 95th Cong., 2d Sess. 122, *reprinted in* 1978 U.S.Code Cong. & Ad.News 1450, 1528.

7. Laredo itself readily admits that an additional stated purpose of the OCSLA was to extend the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901 et seq., to cover the "disability or death of an employee resulting from an injury" arising from exploration or production activities on the Shelf. 43 U.S.C. § 1333(c).

8. The Supreme Court observed:

Since federal law, because of its limited function in a federal system, might be inadequate to cope with the full range of potential legal problems, the Act supplemented gaps in the federal law with state law through the "adoption of State law as the law of the United States." Under § 4, the adjacent State's laws were made "the law of the United States for [the relevant subsoil and seabed] and artificial islands and fixed structures erected thereon," but only to "the extent that they are applicable and not inconsistent with * * * other Federal laws."

* * * * * *

The principles that federal law should prevail, and that state law should be applied only as federal law and then only when no inconsistent federal law applied, were adopted by a Congress in which full debate had underscored the issue. Senator Cordon, in presenting the Lands Act to the Senate, noted that the problem addressed by the committee had been raised by "the fact that the full development of the estimated values in the shelf area will require the efforts and the physical presence of thousands of workers on fixed structures in the shelf area. Industrial accidents, accidental death, peace, and order" present problems requiring a body of law for their solution. Since "as every Member of the Senate knows, the Federal Code was never designed to be a complete body of law in and of itself," the committee decided that state law would have to be referred to in some instances. 99 Cong.Rec. 6962–6963. As Senator Anderson, a member of the conference committee, put it: "The real point is * * * that the language in section 4 provides that Federal laws and regulations shall be applicable in the area, but that where there is a void, the State law may be applicable * * *." 99 Cong.Rec. 7164.

395 U.S. at 357–58, 89 S.Ct. at 1838.

9. The Supreme Court observed further:

An admiralty expert questioned by the committee took the position that application of maritime law would be unwise. "Maritime

mittee on the 1978 amendments to the OCSLA reiterated this sentiment by directing that "Federal law is to be applicable to *all* activities on *all* devices in contact with the seabed for exploration, development, and production." Conf.Rep. No. 1474, 95th Cong., 2d Sess. 80, *reprinted in* 1978 U.S. Code Cong. & Ad.News 1450, 1679 (emphasis supplied). We think it reasonably clear that a contract dispute, such as the one presented here, arising out of the allegedly improper partial construction of a fixed platform falls well within the range of legal controversies Congress expected and intended to be submitted to the district court for resolution under the Act.

Finally, there is precedential support for the proposition that the district court has OCSLA jurisdiction over the instant case. Although the case at bar concerns a contract for the construction of a platform and thus in one sense presents a question of first impression, we have in other contexts applied the OCSLA, often without question, to resolve contractual disputes. *See, e.g., Wallace v. Texaco, Inc.,* 681 F.2d 1088 (5th Cir.1982) (contract for labor on fixed platform); *Dickerson v. Continental Oil Co.,* 449 F.2d 1209 (5th Cir.1971) (indemnity provision in drilling contract), *cert. denied,* 405 U.S. 934, 92 S.Ct. 942, 30 L.Ed.2d 809 (1972); *see also Greer v. Services, Equipment & Engineering, Inc.,* 593 F.Supp. 1075 (E.D.Tex.1984) (indemnity provision in master-servant contract); *Fluor Ocean Services, Inc. v. Rucker Co.,* 341 F.Supp. 757 (E.D.La.1972) (contract to raise drilling platform which had sunk to the ocean floor). *Cf. Gulf Offshore Co. v. Mobil Oil Co.,* 453 U.S. 473, 484, 101 S.Ct. 2870, 2878, 69 L.Ed.2d 784 (1981) (stating in dicta that states have concurrent jurisdiction over "contract actions" arising under the OCSLA). In these cases, as in the instant case, the contracts at issue were, most significantly, intimately connected with an operation on the Outer Continental Shelf which involved the exploration, development, or production of subsurface resources.

In sum, based on both the plain meaning of the OCSLA and congressional intent as manifested in the statute's legislative history, we conclude that the OCSLA is generally applicable to the present litigation and that as a result the district court has subject matter jurisdiction over the instant case.

### III.

■ Laredo's second argument is that, even if the OCSLA does apply, the district court retains its admiralty jurisdiction over the case and that the resulting jurisdictional conflict must be resolved in favor of the application of general maritime law. We agree with Laredo that, where admiralty and OCSLA jurisdiction overlap, the case is governed by maritime law. However, because we think that the district court's admiralty jurisdiction does not extend to the contract dispute at hand, we reject Laredo's claim and hold that the case is governed solely by the OCSLA and the law incorporated by reference thereunder.

■ In making its argument, Laredo necessarily relies on the following provision of the OCSLA:

> To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the Outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the

law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose." Since the Act treats seabed, subsoil, and artificial islands the same, dropping any reference to special treatment for pre-

sumptive vessels, the most sensible interpretation of Congress' reaction to this testimony is that admiralty treatment was eschewed altogether, except to the extent that the Extension of Admiralty Act might make it applicable. 395 U.S. at 365 n. 12, 89 S.Ct. at 1842 n. 12.

outer margin of the Outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area. All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxation laws shall not apply to the Outer Continental Shelf.

43 U.S.C. § 1333(a)(2)(A). Under this provision, state law, except when inconsistent with federal law, applies to the Outer Continental Shelf as surrogate federal law. *See Rodrigue*, 395 U.S. at 355–56, 89 S.Ct. at 1837.

We first considered the operation of this provision in *Pure Oil Co. v. Snipes*, 293 F.2d 60 (5th Cir.1961), which required us to determine which body of law applied to accidents occurring on fixed platforms on the Outer Continental Shelf. Because we thought that the OCSLA reflected a congressional determination that the hazards presented by the production of resources on the Shelf were essentially maritime in nature, we held that federal maritime law applied to these types of incidents.[10] 293 F.2d at 67–69. In a line of cases following *Snipes*, we consistently applied this interpretation of the statute even when the historical tests for determining admiralty jurisdiction were not met. *See, e.g., Loffland Bros. Co. v. Roberts*, 386 F.2d 540 (5th Cir.1967), *cert. denied*, 389 U.S. 1040, 88 S.Ct. 778, 19 L.Ed.2d 830 (1968); *Movible Offshore Co. v. Ousley*, 346 F.2d 870 (5th Cir.1965).

In *Rodrigue v. Aetna Casualty & Surety Co., supra*, the Supreme Court rejected this construction of the OCSLA. The Court in *Rodrigue* was confronted with the question of whether the Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 761 et seq., or state law applied to actions arising out of two accidents occurring on fixed platforms on the Outer Continental Shelf.

Drawing on the OCSLA's legislative history, the Court found that Congress in enacting that statute had intended that the fixed platforms and similar installations erected for the development of resources be treated as though they were federal enclaves in an upland state. According to the Court, Congress had deliberately taken this approach in lieu of treating the structures as vessels because of the permanent or at least stationary nature of these operations on the Shelf. Congress determined that offshore oil and gas activities were usually closely tied to the adjacent state, unlike more transitory traditional maritime activity, to which a generalized admiralty law was appropriate. The Supreme Court held that, because these fixed platforms were to be regarded as artificial islands, DOHSA did not apply of its own force under admiralty principles and thus under the OCSLA did not oust adopted state law.

■■■ *Rodrigue* is important for our purposes not so much for the Supreme Court's specific holding in that case as for the two fundamental, but related premises upon which that holding was based. The first premise is that under the OCSLA, for federal law to oust adopted state law, federal law must first apply independently of the location of the platform or other device at sea. Thus, in the context of oil and gas exploration on the Outer Continental Shelf, admiralty jurisdiction and maritime law will only apply if the case has a sufficient maritime nexus wholly apart from the situs of the relevant structure in navigable waters. This principle is well illustrated by *Kimble v. Noble Drilling Corp.*, 416 F.2d 847 (5th Cir.1969), *cert. denied*, 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970). In *Kimble*, a driller who was injured while working on a stationary platform on the Outer Continental Shelf brought suit against his employer and the platform owner under the Jones Act and general maritime law, re-

---

**10.** We noted specifically that Congress had made the Coast Guard, the agency traditionally charged with maritime matters, responsible for promulgating and enforcing regulations relating to the safety of life and property on the Outer Continental Shelf. We also relied on the fact that Congress apparently believed the dangers posed by the Shelf to be sufficiently maritime to warrant the extension of the LWHCA. 293 F.2d at 67–69.

spectively. At trial, the jury found that the driller was a seaman and injured as a proximate result of the defendants' negligence. The district court entered judgment accordingly. On appeal, we upheld the judgment of the court below on the theory that the driller's seaman status, supported by the evidence, was by itself a sufficient and independent basis for the application of admiralty law. Because the admiralty jurisdiction of the district court was not predicated on the locus of the platform at sea, maritime law was applicable and ousted state law. We stated:

> The Outer Continental Shelf Lands Act does not oust admiralty law having a basis of applicability independent from the location of the platforms at sea; indeed, it specifically provides that the general law of the upland state is made the applicable federal law only to the extent that it is "not inconsistent with ... other Federal laws." In *Rodrigue*, the Supreme Court recognized this limitation. It simply reversed a holding that the Death on the High Seas Act applied to workmen on oil platforms at sea because "the Seas Act does not apply of its own force under admiralty principles" to men working on land. The case at bar is distinguishable in that the Jones Act and the general maritime law do apply of their own force here; they would still apply, in fact, even if we assume that Kimble received his injuries in the heart of the Louisiana mainland, so long as he was acting at the time as a seaman in the service of his ship. Here, Kimble's status as a seaman depended not on the location of the platforms at sea but upon his assignment to, and responsibilities on, the tender, which was unquestionably a vessel.

416 F.2d at 850 (citations & emphasis omitted). *See also Smith v. Pan Air Corp.*, 684 F.2d 1102 (5th Cir.1982) (state law under OCSLA not applicable since action arises out of the maritime-type function of transporting persons over the seas); *Oppen v. Aetna Insurance Co.*, 485 F.2d 252 (9th Cir.1973) (state law ousted under the OCSLA where private boat sustained damage from contact with oil slick).

■ In the context of contract disputes, the principle underlying *Rodrigue* and *Kimble* precludes the application of maritime law except in those cases where the subject matter of the controversy bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 736–38, 81 S.Ct. 886, 890–92, 6 L.Ed.2d 56 (1961) (general discussion on boundaries of admiralty jurisdiction over contracts); 1 Benedict on Admiralty § 183, at 11–6 (1981) (same). In its original brief, Laredo asserts that the instant contract bears this type of relationship in that (1) to perform its contractual obligations, Laredo had to engage numerous seamen as well as ocean-going vessels and (2) the recovery of oil and natural gas from the sea bottom is itself a traditional maritime activity.

■ An agreement to transport people and supplies in a vessel to and from a well site on navigable waters is clearly a maritime contract. *Hale v. Co-Mar Offshore Corp.*, 588 F.Supp. 1212, 1215 (W.D. La.1984); *see also Smith v. Pan Air Corp.*, *supra*, at 1111 ("transporting person over the seas is a maritime-type function"). The contract involved here, however, did more than charge Laredo with the responsibility of carrying workers and supplies to the well site. Laredo's principal obligation under the contract was the construction of a stationary platform, and, as Laredo conceded at oral argument, it is the alleged breach of this obligation that gave rise to the instant action. While the contract no doubt contemplated the hiring of vessels and seamen to build the structure, the subject matter of this case has no direct relationship with these traditional subjects of maritime law. It is fundamental that the mere inclusion of maritime obligations in a mixed contract does not, without more, bring nonmaritime obligations within the pale of admiralty law. That the contract contemplated in part the use of instruments of admiralty, therefore, is not suffi-

cient to oust OCSLA-adopted state law in this case.

 Nor do we think that, under the circumstances existing here, the fact that the contract relates to offshore oil and gas exploration is itself a sufficient basis for the exercise of admiralty jurisdiction. Laredo argues in its original brief that oil and natural gas extraction from the sea bottom is now considered maritime activity and thus a contract for the construction of an offshore platform bears the necessary relationship to maritime concerns for the exercise of admiralty jurisdiction. In support of its claim, Laredo cites a recent line of cases in which we held that, "because of its location," offshore drilling is maritime commerce for purposes of the Longshoremen's and Harbor Workers' Compensation Act.[11] Because these cases did not specifically deal with the OCSLA, however, we find them inapposite. We reach this conclusion because of *Rodrique's* second premise—that the particular policy judgments embodied in the OCSLA preclude in some cases the application of maritime law quite independently of the traditional principles of admiralty.

 In addition to holding that fixed structures on the Outer Continental Shelf were to be treated as an artificial island or federal enclave in an upland state, the Supreme Court in *Rodrigue* found that Congress "deliberately eschewed the application of admiralty principles to these novel structures." 395 U.S. at 355, 89 S.Ct. at 1837. As discussed previously, the legislative history quoted by the Court reveals that Congress considered maritime law ill-adapted to deal with legal disputes arising from the exploration and development of underground resources on the Outer Continental Shelf. Congress as a result provided for the application of state law as surrogate federal law and, according to the Court, assumed that admiralty law would not apply unless explicitly made applicable by statute.[12] Viewed in this light, the OCSLA can only be regarded as a substantive restriction of the district court's admiralty jurisdiction, at least in regard to those cases in which admiralty jurisdiction would otherwise be predicated merely on the fact that the subject matter of the suit deals with the exploration and development of the Outer Continental Shelf outside state territorial waters. *Cf. In re Dearborn Marine Service, Inc.*, 499 F.2d 263, 273 (5th

---

11. *Pippen v. Shell Oil Co.*, 661 F.2d 378, 384 n. 9 (5th Cir.1981); *see also Thornton v. Brown & Root, Inc.*, 707 F.2d 149, 153 (5th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 735, 79 L.Ed.2d 194 (1984); *Herb's Welding v. Gray*, 703 F.2d 176, 180 (5th Cir.1983), *cert. granted,* — U.S. —, 104 S.Ct. 1589, 80 L.Ed.2d 122 (1984); *Boudreaux v. American Workover, Inc.*, 680 F.2d 1034, 1052–53 (5th Cir.1982) (en banc), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). We have also found a contract for the drilling of a well by a submersible inland drilling barge to be maritime in nature. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332 (5th Cir.1981). *But see Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132, 1136 (5th Cir.) (blow out of gas well in dredged canal slip not actionable under Admiralty Extension Act), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981).

12. The Supreme Court stated:
Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, the legislative history shows that Congress did not intend that result. First, Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply. The legislative history of the Lands Act makes it clear that these structures were to be treated as islands or as federal enclaves within a landlocked State, not as vessels.

\* \* \* \* \* \*

Careful scrutiny of the hearings which were the basis for eliminating from the Lands Act the treatment of artificial islands as vessels convinces us that the motivation for this change, together with the adoption of state law as surrogate federal law, was the view that maritime law was inapposite to these fixed structures.

395 U.S. at 361–63, 89 S.Ct. at 1840–41; *see also supra* note 9. In *Gulf Offshore Co. v. Mobil Oil Corp., supra,* the Supreme Court observed: "Congress was not unaware ... of the close, longstanding relationship between the Shelf and the adjacent States. This concern manifested itself primarily in the incorporation of the law of adjacent States to fill gaps in federal law." 453 U.S. at 479 n. 7, 101 S.Ct. at 2876 n. 7.

Cir.1974) (OCSLA may require application of state law even though accident was not confined to the physical boundaries of the platform), *cert. dismissed,* 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975).

■ Although *Rodrigue* and most cases exploring the scope of the OCSLA's restriction on admiralty jurisdiction have involved accidents occurring on or near platforms, the concerns voiced by Congress over the inaptness of maritime law in the resource-developing context were general in nature and apply equally well to the technologically difficult task of platform construction and its inevitable attendant legal problems. We thus conclude that in the instant context federally adopted state law is not ousted by maritime law.

### IV.

For the reasons stated above, we uphold the district court's finding that it lacked admiralty jurisdiction over the instant case. However, because the OCSLA vests district courts with original jurisdiction over cases and controversies arising out of any operation conducted on the Outer Continental Shelf involving the exploration, development, or production of natural resources, we find that the district court is empowered to hear the case. We therefore remand the case to give the district court an opportunity to invite Laredo to amend its pleadings to assert the correct jurisdictional basis for its action. *See* 28 U.S.C. § 1653; *Illinois Central Gulf R. Co. v. Pargas, Inc.,* 706 F.2d 633, 638 (5th Cir. 1983); *Joiner v. Diamond M. Drilling Co.,* 688 F.2d 256, 264–65 (5th Cir.1982).

REVERSED AND REMANDED.