IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-60103
_____


DONALD SKETOE,

Petitioner,

versus

EXXON COMPANY, USA; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT
OF LABOR,

Respondents.

_____

Petition for Review of an Order
of the Benefits Review Board

_____

September 13, 1999

Before REAVLEY, POLITZ and SMITH, Circuit Judges.

REAVLEY, Circuit Judge:

This case presents the question of the back-up responsibility of a mineral lessee for

longshoremen's compensation for the employee of a drilling contractor. Donald Sketoe and the

Office of Workers' Compensation Programs (the Director) appeal an adverse decision of the

Benefits Review Board (BRB), holding that Exxon was not obligated to pay Sketoe's

compensation benefits. Because of the difference between the contractual obligation of Sketoe's

employer to Exxon and Exxon's obligation to its lessor, we affirm.

I.      Background

The United States Government executed an oil and gas lease of a tract off the Louisiana

coast to Exxon.  Exxon subsequently contracted with Dolphin Titan (DT) to drill on the tract.

Sketoe was an employee of DT who worked on the Exxon-tract operation.  In the course and

scope of his employment, Sketoe injured his hand.  DT's compensation carrier, Northumberland

Insurance Co., paid Sketoe's compensation benefits until it became insolvent.  Following

Northumberland's bankruptcy, DT assumed payment of the benefits.  Approximately one year

later, DT also became insolvent.  Sketoe then filed a claim against Exxon for payment of the

benefits, alleging that section 904(a) of the Longshore and Harbor Workers' Compensation Act

(LHWCA),[1] required Exxon to cover for its "subcontractor," DT.

The first administrative law judge (ALJ) to hear the case ruled that Exxon was liable under

section 904(a) and the analysis found in *Director v. National Van Lines, Inc.*[2]  On appeal, the

BRB reversed, holding that *Chavers v. Exxon Corp.*[3] better conformed to the particular facts of

the dispute.  On remand, a different ALJ found that the evidence did not support Exxon's liability

under the test in *Chavers*.  Following another appeal, the BRB held that substantial evidence

supported the second ALJ's conclusion, and it affirmed.

II.     Discussion

We review an appeal from the BRB *de novo* and will affirm if the judgment of the ALJ is

---

[1]33 U.S.C. §§ 901-950.

[2]613 F.2d 972 (D.C. Cir. 1979).

[3]716 F.2d 315 (5th Cir. 1983).

"supported by substantial evidence and consistent with the law."[4] The Director urges that its construction of the LHWCA is entitled to deference. Both this court and the agency must give effect to the unambiguous language of the statute.[5] Furthermore, we afford no special deference to agency litigation positions that are "'unsupported by regulations, rulings, or administrative practice.'"[6] Because we have been presented with no administrative regulation, ruling, or other indication that the Director's position in this case is the product of agency deliberation and judgment, we reject the Director's contention.

A.    Construction of Section 904(a)

LHWCA section 904(a) governs Exxon's potential liability for payment of Sketoe's compensation benefits. It states:

> Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title. *In the case of an employer who is a subcontractor, only if such subcontractor fails to secure the payment of compensation shall the contractor be liable for and be required to secure the payment of compensation. . . .*[7]

The injured employee claiming the benefits of section 904(a) against a "contractor" must have been employed by a "subcontractor." The only difficulty is understanding what Congress intended by its use of the word "contractor." We apply the term's ordinary meaning, informed by

---

[4]*Total Marine Servs., Inc. v. Director*, 87 F.3d 774, 776 (5th Cir. 1996).

[5]*See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82, 81 L. Ed. 2d 694 (1984).

[6]*Smiley v. Citibank (S.D.) N.A.*, 517 U.S. 735, 739-41, 116 S. Ct. 1730, 1732-33, 135 L. Ed. 2d 25 (1996) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S. Ct. 468, 473-74, 102 L. Ed. 2d 493 (1988)); *see Total Marine*, 87 F.3d at 776-77 n.2.

[7]33 U.S.C. § 904(a) (emphasis added).

the intent of the legislature as it may be divined from the design of the Act.[8] The term

"contractor"

> is strictly applicable to any person who enters into a contract, but is commonly reserved to designate one who, for a fixed price, undertakes to procure the performance of works or services on a large scale, or the furnishing of goods in large quantities, whether for the public or a company or individual. *Such are generally classified as general contractors (responsible for entire job) and sub-contractors (responsible for only portion of job;* e.g., *plumber, carpenter).*[9]

In light of Congress's choice of the coordinate term, "subcontractor," construing the statute to require a "general contractor" accords with the common understanding of "contractor." It also conforms to the purposes of the provision, which is aimed at deterring "unscrupulous employers from dividing their work among a number of smaller, uninsured entities" and which encourages general employers to contract with adequately insured subcontractors.[10] At the same time, it preserves the distinction between "contractors" and owners of property.[11] We hold therefore that section 904(a) premises liability on a finding that the principal is subject to some contractual obligation, which it, in turn, passed in whole or in part to the subcontractor. To attach liability to Exxon for compensation benefits via the statute, therefore, Exxon must have been subject to the same contractual obligation that DT contracted with Exxon to perform. For convenience, this may be referred to as a "two contract" requirement.

---

[8]*See City of Dallas v. FCC*, 118 F.3d 393, 395 (5th Cir. 1997); *Mississippi Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 300 & n.39 (5th Cir. 1994)(en banc).

[9]BLACK'S LAW DICTIONARY 295 (5th ed. 1979) (emphasis added).

[10]*See National Van Lines*, 613 F.2d at 986.

[11]*See id.* at 987 n.58.

The District of Columbia Circuit has considered the application of section 904(a).[12] That court's interpretation of the statutory language supports our own. It formulated the required relationship between the parties as such:

> A general employer will be held secondarily liable for workmen's compensation when the injured employee was engaged in work either that is a subcontracted fraction of a larger project or that is normally conducted by the general employer's own employees rather than by independent contractors.[13]

The essential feature is that the injured claimant must have worked pursuant to a double set of contractual obligations.[14] As support, *National Van Lines* cited an Alaska state decision under a statute substantially identical to section 904(a), which also required a two contract relationship. That case provided that the relationship is satisfied only when there is "(1) the existence of a contractual obligation on the part of a person held to be a contractor, and (2) a subletting of a part of that obligation to the person held to be a subcontractor."[15] Importantly, *National Van Lines* also acknowledged that, if the principal employer owes no contractual duty related to the services of the subcontractor, liability for benefits does not attach. In a footnote, the opinion described the paradigmatic case as one where "a property owner contracts with a contractor for

---

[12]The case involved application of the District of Columbia's workers' compensation statutory employer provision. The District has adopted the LHWCA for its workers' compensation scheme. *See id.* at 976 n.2.

[13]*Id.* at 986.

[14]The language in the latter half of the statement is dictum, for the facts in *National Van Lines* clearly involved two separate contractual obligations. *See id.* at 986-87. Neither is that problem presented by the instant appeal.

[15]*Id.* at 987 (citing *Thorsheim v. State*, 469 P.2d 383, 388-89 (Alaska 1970)).

services to the property."[16] The National-Eureka contract was not an "owner" case because National had contracted with third-party clients and delegated its duty to perform those services to Eureka.

The BRB has long been cognizant of the distinction between owners and general contractors for purposes of section 904(a) coverage. In *Dailey v. Troth*,[17] Dailey worked as a carpenter's helper for EHT Construction Co., which had entered into an oral agreement with Starlit to perform carpentry work on two properties Starlit owned. In the course of this employment, Dailey was shot and injured by an intruder. The ALJ held both EHT and Starlit jointly liable for compensation payments under section 904(a). Neither EHT or Starlit was insured for such liability, and Starlit appealed. The BRB reversed, noting that:

> [i]n contrast to the *National Van Lines* situation, here Starlit had not been contractually obligated to perform the duties which claimant was executing at the time of his injury; the work performed by [EHT] and claimant thus did not constitute "a subcontracted fraction of a larger project."[18]

In the present case, the BRB reversed the first ALJ's determination that *National Van Lines* stated the appropriate test for liability under section 904(a), replacing it with the test announced in *Chavers*. We hold that neither case announces a "test" for application of the statute, for the language of the statute is plain as written. Whether a case fits the provision must be decided on its particular facts. *Chavers* was decided under Louisiana's statutory employer law, a state workers' compensation provision that is significantly different from the federal statute

---

[16]*Id.* at n.58.

[17]20 Ben. Rev. Bd. Serv. (MB) 75 (1986).

[18]*Id.* (quoting *National Van Lines*, 613 F.2d at 986).

we consider today. In *Chavers* we expressly noted that "[t]he statutory language vital to the current inquiry is found in the phrase: 'part of his trade, business or occupation.'"[19] Section 904(a) of the LHWCA contains no such language. The BRB erred when it held that *Chavers* stated an appropriate benchmark for Exxon's liability for LHWCA compensation.

The LHWCA distinguishes between employers who are owners and those who are general contractors working under contractual obligations to others. If, and only if, we determine that Exxon delegated "the performance of portions of its contractual obligations" to DT -- as was the case between National and Eureka, but not Starlit and EHT -- then the section 904(a) relationship was formed and Exxon is statutorily liable for Sketoe's workers' compensation payments.[20] Otherwise, section 904(a) does not apply. Because Sketoe was the employee of a drilling contractor, the determination depends upon the nature of the drilling obligations that Exxon owed to the United States, the oil and gas lessor.

B.      Exxon's Status as an Oil and Gas Lessee

We consider this offshore oil and gas lease in light of Louisiana mineral law.[21] Louisiana's

_____

[19]*Chavers*, 716 F.2d at 316 (quoting La. Rev. Stat. Ann. § 23:1061 (West 1998)).

[20]*See National Van Lines*, 613 F.2d at 987.

[21]*See* 43 U.S.C. § 1333(a)(2)(A). The following clauses in the offshore lease are relevant to the disposition of this case. A habendum clause in section five establishes that the lease will remain in effect during a primary term of five years and for "so long thereafter as oil or gas may be produced from the leased area in paying quantities." Section three contains specific obligations Exxon agreed to undertake, including the following:

> The Lessee agrees . . . [w]ith respect to each lease year
> commencing prior to a discovery of oil and gas on the leased area,
> to pay the Lessor . . . a rental[; and t]o diligently drill and produce
> such wells as are necessary to protect the Lessor from loss by
> reason of production on other properties or, in lieu thereof . . . to
> compensate the Lessor for failure to drill and produce any such

codal law differs considerably from the common law of estate and future interests that dominates the law of property ownership in most oil-producing jurisdictions.[22] Louisiana presently maintains a specialized Mineral Code in addition to its Civil Code. Only if the Mineral Code does not directly or by implication resolve the issue before us may we look to the principles embodied in the Civil Code or to other cases for guidance.[23]

In Louisiana, ownership confers direct, immediate, and exclusive authority over a thing.[24] Because Louisiana is a non-ownership in place jurisdiction, the owner of land does not own subsurface minerals outright, but only "the exclusive right to explore and develop his property for

---

> well. In the event that this lease is not being maintained in force by other production of oil or gas in paying quantities or by other approved drilling or reworking operations, such payments shall be considered as the equivalent of production in paying quantities for all purposes of this lease.

The delay rental clause follows the "unless" form. "Where an oil, gas and mineral lease contains such a provision, the intentional failure of the lessee to drill or to pay the delay rental on or before the date specified in the contract ipso facto terminates the lease . . . ." *Richard v. Tarpon Oil Co.*, 269 So.2d 261, 264 (La. Ct. App. 1972). To protect the leasehold against drainage from wells on tracts not covered by the lease, the parties expressly provided that Exxon would either drill or pay substitute royalties. Finally, Louisiana law implies a duty of prudent operation, including an obligation to drill when a reasonably prudent operator would do so. *See* La. Rev. Stat. Ann. § 31:122 (West 1989) (reasonably prudent operator standard); La. Civ. Code Ann. art. 2710 (West 1996) (lessee must act as a good administrator). The lease includes a surrender clause, which provides the procedure for notice of surrender, preserves the lessor's rights in accrued rentals and royalties, and requires the lessee to abandon its wells in an appropriate condition.

[22]*See, e.g.*, *Viterbo v. Friedlander*, 120 U.S. 707, 712-13, 7 S. Ct. 962, 964-65, 30 L. Ed. 776 (1887); Patrick H. Martin & J. Lanier Yeates, *Louisiana and Texas Oil & Gas Law: An Overview of the Differences*, 52 LA. L. REV. 769, 769-823 (1992).

[23]*See* La. Rev. Stat. Ann. § 31:2.

[24]*See* La. Civ. Code Ann. art. 477(A) (West Supp. 1999).

the production of such minerals and to reduce them to possession and ownership."[25] That

exclusive right may be conveyed to another through execution of a mineral lease.[26]

The Louisiana mineral lease includes features that are characteristic of both contracts and

rights in property.[27] For instance, we interpret the terms of the lease agreement as we would any

other lease.[28] Indeed, the lease itself is a "contract."[29] As such, it does not create an unlimited

mineral servitude, and Louisiana's liberative prescription for ten years nonuse therefore does not

apply.[30] On the other hand, as an "incorporeal immovable" a mineral lease carries "real rights"

and is "subject to the laws of registry."[31] Strictly speaking, the mineral lease creates a kind of

servitude called a "limited personal servitude."[32] "Limited personal servitudes are real rights that

confer on a person limited advantages of use or enjoyment over an immovable[, *i.e.*, realty,]

---

[25]La. Rev. Stat. Ann. § 31:6.

[26]*See id.* § 31:15.

[27]*See id.* § 31:16 cmt. (noting that the mineral lease is "a hybrid institution"); *see generally* 1A W.L. SUMMERS, THE LAW OF OIL AND GAS § 167 (2d ed. 1954 & Supp. 1999); Martin & Yeates, *supra*, at 823-26.

[28]*See* La. Rev. Stat. Ann. § 31:2; *Massie v. Inexco Oil Co.*, 798 F.2d 777, 779 (5th Cir. 1986).

[29]La. Rev. Stat. Ann. § 31:114.

[30]*See Reagan v. Murphy*, 105 So. 2d 210, 215 (La. 1958).

[31]*See* La. Rev. Stat. Ann. §§ 31:16, :18; *St. Charles Land Trust v. St. Amant*, 217 So. 2d 385, 390 (La. 1968) ("Under Louisiana law, the mineral leases and servitudes held by the trustees are immovable property.").

[32]*See* 3 A.N. YIANNOPOULIS, LOUISIANA CIVIL LAW TREATISE: PERSONAL SERVITUDES § 223, at 450 (3d ed. 1989).

belonging to another person."[33]  Because mineral leases establish real rights, the authority to

create a mineral lease is limited to possessors of executive rights in the mineral property.[34]

Similarly, the lessor impliedly warrants title to the realty when subjecting it to a mineral lease.[35]

The extent to which a Louisiana mineral lease creates contractual or property rights and

obligations has been the subject of long debate among the legislature, the courts, and the "oil

fraternity."[36]  We will not disturb the current resolution; in fact, we are bound to adhere to the last

authoritative word in the state.  Our question, however, is not what the lease may be called or

what tools we may employ to interpret its terms, but rather, whether the nature of the obligation

to drill fits within the meaning and purpose of the federal statute.  As to that, we agree with the

commentary accompanying article 16 of the Mineral Code:

> It is desirable to recognize that the combined substance of the
> patchwork of existing jurisprudence and statutes together with the
> functional realities of the mineral leasing transaction make it clear
> that though the mineral lease is a hybrid institution, it is a real right
> and should be recognized as such. . . .  All things considered, the
> lease has the major characteristics of a real right: the mineral lessee
> may follow the land, regardless of transfers of ownership; the
> mineral lessee may assert his rights against the world just as the
> proprietor of any other real right; he may enjoy directly and draw
> from the land a part of its economic advantages by appropriating a
> wasting asset; he has certain rights of preference; and he holds a
> right that is in reality susceptible of a type of possession through

---

[33]*Id.* at 448-49.

[34]*See* La. Rev. Stat. Ann. § 31:116.

[35]*See* La. Rev. Stat. Ann. § 31:120.

[36]*See, e.g.*, *Reagan v. Murphy*, 105 So. 2d 210, 213, 211-15 (La. 1958); *Mire v. Sunray DX Oil Co.*, 285 F. Supp. 885, 889-90 (W.D. La. 1968); Martin & Yeates, *supra*, at 823-26 (all recounting the course of legislative and judicial decisions over the status of a mineral lease as conveying rights in realty or merely as personal contracts).

exercise.[37]

We believe that the obligations to drill found in the present lease arrangement -- namely, express obligations in the primary term and for protection from drainage, and implied otherwise in the various obligations of prudent operation -- are best said to be correlative and incidental of the real rights transferred by it, namely, the exclusive power to prospect for, produce, and take possession of oil and gas.[38]  It is pertinent to this decision that the lessee may abandon its exclusive right and, thus, its duty to drill, and that the lessor's remedy for the lessee's failure to drill is cancellation of the lease.[39]  This is so because the duty to drill flows directly from the real rights created by the lease agreement.[40]  We hold that such an obligation is not the kind that would make the lessee a general contractor so that the drilling contractor may be considered a "subcontractor" within the meaning of the LHWCA.

Sketoe and the Director assert that the Fifth Circuit has previously decided the question. In *Nations v. Sun Oil Co. (Del.)*, the issue was whether Sun Oil was "a contractor and . . . Mississippi Welding a subcontractor . . . so as to make Nations a statutory employee of Sun Oil"

---

[37]La. Rev. Stat. Ann. § 31:16 cmt.

[38]*Cf.* La. Civ. Code Ann. art. 1763 (West 1987); *Mire*, 285 F. Supp. at 889; *Hawthorne Oil & Gas Corp. v. Continental Oil Co.*, 368 So. 2d 726, 731-32 (La. Ct. App.), *rev'd on other grounds*, 377 So. 2d 285 (La. 1979).

[39]*See, e.g.*, *Carter v. ArkansasLouisiana Gas Co.*, 36 So. 2d 26, 30 (La. 1948).  *Cf.* La. Civ. Code Ann. art. § 1764.

[40]*See Carter*, 36 So. 2d at 28 ("[T]he main consideration of a mineral lease is the development of the leased premises for minerals . . . ."); Thomas A. Harrell, *A Mineral Lessee's Obligation to Explore Unproductive Portions of the Leased Premises in Louisiana*, 52 LA. L. REV. 387, 387 (1991) ("[T]he lessor's return from the contract is dependent upon production *occurring from the land*." (emphasis added)).

11

under Mississippi's statutory employer law.[41]  We recognized the "two contract" nature of that statute, stating: "a subcontractor is one who enters into a contract, express or implied, for performance of an act with a person who has already contracted for its performance, or who takes a portion of a contract from the principal or prime contractor."[42]  We noted that the record was not developed as to Sun Oil's relationship to the property, and remanded for determination of whether Sun Oil was the lessee and whether Mississippi Welding was a subcontractor.[43]  Before remanding, we provided the following discussion of the issue:

> Prior to oral argument, Sun Oil asserted in this court that it was the lessee of the mineral rights at the site.  If this statement is corroborated or conceded, that may be sufficient to make Mississippi Welding a subcontractor, for the lease of mineral rights carries an implied covenant that the lessee will exercise the duty of a prudent operator to develop leased minerals.  If Sun Oil undertook this duty then the contract between Sun Oil and Mississippi Welding would be a subcontract in which Mississippi Welding contracted to perform a portion of the activity Sun Oil was already contractually obligated to perform.[44]

*Nations* does not control this case.  The lease was not available in the record, and the statement was advisory and gratuitous.  The Mississippi Supreme Court has subsequently ruled in a manner that is directly contrary to the reasoning expressed in *Nations*.  In *Nash v. Damson Oil Corp.*,[45] it addressed a case similar on its facts to *Nations*.  The defendant, Damson, was the

---

[41]695 F.2d 933, 937 (5th Cir. 1983).

[42]*Id.* (internal quotation marks omitted).

[43]*See id.* at 938.

[44]*Id.* at 937-38.

[45]480 So. 2d 1095 (Miss. 1985).

lessee of a producing oil unit.[46]  Damson entered into a service contract with Trigger Contractors

for Trigger to perform certain work with respect to oil and gas wells, in addition to other services

Damson might require until the contract was canceled.[47]  Nash, Trigger's employee, was injured

while installing a hook up and a flow line with a check valve on a Damson oil well.[48]  Nash

collected compensation from Trigger and its insurer, but filed a tort claim against the lessee,

Damson.[49]  Damson raised the exclusive remedy defense, asserting that it was a statutory

employer under the state statutory equivalent to LHWCA section 904(a).[50]  The trial court

granted Damson summary judgment on that theory.   The supreme court stated the issue as such:

"If Damson Oil Corporation is a 'contractor' who is an 'employer' . . . , Damson wins.  On the

other hand, if Damson is not a 'contractor' and thus not a statutory employer, Nash is entitled to

proceed further in the trial court."[51]  The language of the statutory employer provision is almost

identical to section 904(a), especially regarding the use of the terms "contractor" and

"subcontractor."  The *Nash* court noted that in *Doubleday v. Boyd Constr. Co.,*[52] the principal

Mississippi case responsible for construing the statutory employer provision and upon which

*Nations* relied, the general contractor "had no ownership interest in the premises.  Moreover, the

---

[46]*See id.* at 1096.

[47]*See id.*

[48]*See id.* at 1097.

[49]*See id.* at 1097-98.

[50]*See id.* at 1098.

[51]*Id.*

[52]418 So. 2d 823 (Miss. 1982).

13

contractor in *Doubleday* occupied the position persons of common understanding would label

general contractor or prime contractor."[53]  Thus, the defendant in *Doubleday* was the "kind of

'contractor' contemplated by the statute."[54]  *Nash* compared that situation with the circumstances

in *Falls v. Mississippi Power & Light Co.*[55]  In *Falls*, MP&L was a permittee under a special use

permit granted by the National Park Service allowing it to run power lines across certain public

land, and the permit imposed special conditions upon MP&L.[56]  The plaintiff's decedent was

employed by a company that MP&L had hired to cut back the pines around the power lines.  The

*Falls* court distinguished *Doubleday*, holding that the special use permit "did not constitute

[MP&L] as a general or prime contractor for work to be done . . . along the right-of way . . .

pursuant to [the] contract" between MP&L and the trimming company.[57]  *Nash* noted the

difficulty of interpreting the operative language of Mississippi's statute, which, like the LHWCA,

does not define "contractor" or "subcontractor."[58]  It then held that Damson, as an oil and gas

lessee, did not satisfy the two contracts requirement:

> Without question Damson is a contractor in a generic sense.
> Damson has a contractual relationship with the owners of the land
> imposing various duties and obligations upon each.  Damson is also
> a contractor in the sense that it has a contract with Trigger
> imposing obligations and duties upon each.  The operative point is

---

[53]*Nash,* 480 So. 2d at 1098.

[54]*Id.*

[55]477 So. 2d 254 (Miss. 1985).

[56]*Nash*, 480 So. 2d at 1099.

[57]*Falls*, 477 So. 2d at 258.

[58]*Nash*, 480 So. 2d at 1100.

14

that Damson's interest, use and activities with respect to the premises are wholly different in nature from those of one ordinarily considered a general or prime contractor—the sort of contractor we believe contemplated by *Doubleday*. Damson's position with respect to the premises is similar to that of [MP&L] in *Falls* and unlike that of [the subcontractor] in *Doubleday*. Damson is an operator or even in a sense an owner *pro hac vice*, a lessee. On the other hand, Damson lies outside the common understanding of such terms as "prime contractor" or "general contractor". Therefore, Damson is not the sort of "contractor" within the meaning and contemplation of [the MWCA].[59]

In a footnote immediately following this statement, the court recognized that "[i]n briefs and at argument, the parties have discussed the case of *Nations v. Sun Oil Co.* We trust it will be apparent that anything in *Nations* contrary to our decision today should be considered with care."[60] In a concurrence, four Justices further clarified that the basis of *Nash*'s distinction of *Falls* and *Doubleday* was the two contract theory and the requirement of a prime or general contractor, which was not satisfied by the obligations, implied or express, of an oil and gas lessee.[61] This further bolsters our present conclusion about the status of a Louisiana mineral lessee under the LHWCA's two contract requirement.

The holding of a previous panel will bind this panel unless the pronouncements are merely dictum or are pretermitted by "a clearly contrary subsequent holding of the highest court of the state."[62] As both are true of the squib from *Nations*, we are not bound by it.

---

[59]*Id.* (citation omitted).

[60]*Id.* at n.1 (citation omitted).

[61]*See id.* at 1101 (Roy Noble Lee, P.J., with whom Patterson, C.J., Walker, P.J., and Hawkins, J., join concurring).

[62]*FDIC v. Abraham*, 137 F.3d 264, 269 (5th Cir. 1998).

15

Our decision in *Pure Oil Co. v. Snipes*,[63] however, provides an appropriate source for guidance. Like Exxon, Pure Oil owned and operated a drilling platform off the coast of Louisiana.[64] The plaintiff, Snipes, was an employee of Loffland, an independent drilling contractor.[65] Loffland had undertaken to drill two wells for Pure Oil on the platform.[66] While engaged in this employment, Snipes fell from the platform and severely injured himself.[67] The question before the court was what limitations period, federal or state, controlled the prescription of Snipe's negligence claim against the platform owner, Pure Oil.[68] In the course of our decision, we noted that the exclusive remedy provision of the LHWCA did not apply to bar Snipe's tort suit against Pure Oil.[69] The LHWCA quid pro quo mandates that section 905 will limit tort liability only for those parties subject to the application of section 904(a)'s liability for payment of compensation benefits.[70] Our conclusion that section 905 did not "operate for the benefit of

---

[63]293 F.2d 60 (5th Cir. 1961).

[64]*See id.* at 62.

[65]*See id.* at 63.

[66]*See id.*

[67]*See id.* at 63-64.

[68]*See id.* at 62.

[69]*See id.* at 67-68.

[70]Sketoe argues unpersuasively that we should read cases interpreting the statutory employer provision broadly and take a narrow reading of those considering the exclusive remedy provision. He argues that this approach furthers the purposes of workers' compensation acts. We disagree. We interpret both provisions identically to protect the integrity of the workers' compensation system's quid pro quo, which exchanges no-fault liability with limited compensation benefits and immunity from tort liability. *See Taylor v. Bunge Corp.*, 845 F.2d 1323, 1326 (5th Cir. 1988).

16

anyone else and certainly not for a third party" like Pure Oil supports our determination today that

Exxon is not liable for payment of compensation benefits to Sketoe under section 904(a).[71]

The only Louisiana case applying a two contract statutory employer provision to an oil

and gas lessee is equivocal about the nature of the drilling obligation.  In a tort suit brought by an

injured drilling worker against the oil and gas lessee, the court of appeal held that the lessee was

not a statutory employer for summary judgment purposes.[72]  Louisiana Land and Exploration Co.

(LLEC) was the oil and gas lessee, and Burleigh was an employee of Goldrus Drilling Co., with

whom LLEC had contracted to perform drilling services.  At summary judgment, LLEC

interposed the exclusive remedy provision of the workers' compensation statute as a defense to

the injured employee's tort claim.[73]  The court first noted that the exclusive remedy defense

applied only in the "two contracts" situation -- *i.e.*, when "the principal has contracted to perform

some work for a third party and then contracts out all or part of the work to a subcontractor-

employer."[74]  Like the Director and Sketoe in the present appeal, LLEC argued that, "as mineral

lessee, it has a contract with the owners of the land to develop leased minerals, and in furtherance

of that contract with the lessors, it subcontracted [the well] to Burleigh's employer."[75]  LLEC

cited *Nations* in support of this argument.  The Louisiana court of appeal disagreed, holding that

"there is no summary judgment evidence of a general contract between the lessors of the mineral

---

[71]*Snipes*, 293 F.2d at 68.

[72]*See Burleigh v. South La. Contractors, Inc.*, 525 So. 2d 87, 90-91 (La. Ct. App. 1988).

[73]*See id.* at 90.

[74]*Id.* (internal quotation marks omitted).

[75]*Id.*

17

interests and Louisiana Land, as lessee, to perform specific work at the time Louisiana Land subcontracted with Goldrus."[76] Although this state court opinion supports our view to some extent, it does not hold outright that the drilling obligation under an oil and gas lease can never be considered a "contractual" obligation in the two contracts context; rather, it merely holds that summary judgment was premature when the lease was not even in the summary judgment record.[77]

In sum, we conclude that Exxon is most appropriately considered as the owner of a real right, with a duty that was correlative and incidental of that real right, when it engaged the drilling services of DT. It was not a general contractor passing its own purely contractual obligation to its subcontractor. For this reason, Exxon is not liable under section 904(a).

AFFIRMED.

---

[76]*Id.* at 90-91.

[77]*See id*.

POLITZ, Circuit Judge, dissenting:

Convinced that Exxon is a "contractor" under § 904(a) and is thus liable for Sketoe's injury, I must respectfully dissent.

I agree with the majority's framing of the issue for "two contract" liability under § 904-- that a contractually obligated principal contracts with a subcontractor to perform all or part of the required duties. I also agree that the BRB unnecessarily muddled the statutory language by applying the Louisiana workers' compensation law found in **Chavers v. Exxon Corp.**[78]

I differ with the majority, however, in its decision that Exxon was not contractually obligated with the United States when it leased the offshore property. First, Exxon was contractually obligated to perform drilling activities under its lease with the Department of the Interior if it wished to retain the lease. Section three of the lease, entitled "Obligations of Lessees," states that Exxon is required to pay a delay rental every year to the United States prior to the production of oil or gas.[79] The lease was for a period of five years, or so long as oil or gas is produced in paying quantities. Thus, the lease would be terminated if oil or gas was not produced in paying quantities during and after this five-year period.

Exxon also was contractually obligated to drill because of Louisiana Mineral Code provisions specifically requiring a mineral lessee to develop leased property as a reasonably prudent operator for the mutual benefit of both parties. Section 122 of the Louisiana Mineral Code, La. Rev. Stat. § 31:122, is entitled "Lessee's obligation to act as reasonably prudent

---

[78] 716 F.2d 315 (5th Cir. 1983).

[79] Section 3(a)(1) of the lease states that the lessee agrees "[w]ith respect to each lease year commencing prior to a discovery of oil or gas on the leased area, to pay the Lessor on or before the first day of each such year, a rental of $3.00 per acre or fraction thereof."

operator" and reads as follows:

> A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.

The comments under this article, which are there to aid the understanding and application of the article, are particularly helpful in resolution of Exxon's obligation under the mineral lease at bar. These comments detail how the doctrine of implied covenants under common law is found under the Civil Code, directing one through article 2710 requiring a lessee to be a "good administrator"[80] and noting the jurisprudence in the mineral field translating this into a "reasonable, prudent operator."[81]

The comments continue with a listing of the four obligations of a prudent operator: (1) the obligation to develop known mineral producing formations; (2) the obligation to explore and test all portions of the leased premises after discovery of minerals in paying quantities; (3) the obligation to protect the leased property against drainage by wells located on neighboring property; and (4) the obligation to produce and market minerals discovered in paying quantities. Each of the four obligations is posited in the setting of a "reasonable, prudent operator."

By relegating these duties to be mere incidents of ownership, the majority ignores both the explicit obligations under Exxon's contract, as well as the implicit obligations as a reasonably prudent operator under the Louisiana Mineral Code and interpretive jurisprudence. It is a simple fact that Exxon had contractual duties that it in turn passed on to Dolphin Titan. This is all that §

---

[80] La. Civ. Code art. 2710.

[81] *See, e.g.*, **Carter v. Arkansas Louisiana Gas. Co.**, 36 So. 2d 26 (1948).

904(a) requires.

The majority's position also contravenes the purpose underlying contractor liability in § 904(a). The purpose of this section is to

> protect injured employees engaged in a common enterprise from the irresponsible failure of their immediate employer to insure. By imposing secondary liability on the general employer or contractor, the provision deters unscrupulous employers from dividing their work among a number of smaller, uninsured entities, and creates an incentive for the general employer to insist that his subcontractors be adequately insured.[82]

My conclusion that Exxon is a "contractor" fulfills these purposes. Exxon is in a superior bargaining position to ensure that its subcontractors carry the requisite authorized insurance. Its failure to assure that Dolphin Titan had authorized insurance is at the essential core of the current dispute. The policies underlying secondary contractor liability fully warrant placement of liability upon Exxon.

Because Exxon is contractually obligated to drill and in turn contracted with Dolphin Titan to perform that drilling on its behalf, I would conclude that Exxon is a "contractor" responsible for compensation under § 904(a) and that the Benefits Review Board erred in denying Sketoe's claim against Exxon. Accordingly, I must respectfully dissent.

---

[82] **Director, OWCP v. National Van Lines, Inc.**, 613 F.2d 972, 986 (D.C. Cir. 1979).